**AFFIRM; and Opinion Filed February 20, 2014.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-12-01418-CR**

**ELIZABETH DENISE ESCALONA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1159638-V**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Fillmore
Opinion by Justice Lang-Miers

Appellant Elizabeth Denise Escalona pleaded guilty to causing serious bodily injury to a child. The trial court found appellant guilty and assessed punishment at ninety-nine years in prison. In five issues on appeal, appellant argues that her plea was involuntary because she received ineffective assistance of counsel, the trial court erred in admitting evidence, and the trial court violated her due process rights. We affirm.

### BACKGROUND

After appellant pleaded guilty at her plea hearing, the trial judge explained to her: "This is a first-degree felony, carries a penalty range of 5 years confinement in the penitentiary up to life or 99 years and a fine of up to $10,000. I can set the punishment anywhere within that

range." The judge also stated that he could sentence her to deferred adjudication probation for two to ten years and explained the terms of probation. Then the judge and appellant had the following exchange:

> [The Court]: So that's pretty much a complete explanation of the punishment range and the things that could happen to you along the way. Do you have any question about that?
>
> [Appellant]: No, sir.

On the same day as the plea hearing, appellant signed a plea agreement in which she admitted her guilt and entered an open plea. The document stated that the punishment range for the charged offense was "5–99 years or Life and an optional fine not to exceed $10,000.00."

At the sentencing hearing, Dr. Amy Barton, a child abuse pediatrician, testified that appellant's almost three-year-old child was admitted to a hospital emergency room comatose. The child was soon transferred to the intensive care unit in critical condition and placed on life-support measures, including a ventilator because she could not breathe on her own. She had suffered extensive injuries. Dr. Barton testified, "I see a lot of children and this was one of the most shocking cases that I have seen." The child had bruising on her genitals, buttocks, belly, ribs, thorax, arms, back, top of her shoulder, legs, right foot, knee, pelvis, cheeks, forehead, scalp, nose, bridge of her nose, underside of her chin, front part of her throat, and back of her neck. She had abrasions around her eyes, near her right ear, and on her scalp, back, arms, back of her neck, left calf, and right foot, and a small laceration inside her mouth. The child had glue in her eyelashes and glue residue on her eyelids. The child's hands had bruising, abrasions, and glue residue in between her fingers. She had paint and glue on the palm of her right hand and white paint on her left index finger and thumb. She had patches of missing hair and broken hairs indicating hair pulling. The child also had a bite mark in the crease of her right elbow and on her right buttock.

Dr. Barton testified that the child's genital injuries were caused by "[s]ome type of blunt force trauma." The child had suffered a hemorrhage around her brain and swelling on the left side of her brain caused by blunt force trauma that occurred within hours of her admission to the hospital. She also had bruises on her lungs caused by blunt force trauma that "happened within the last few days." Her intestines had gone into "shock bowel"—meaning her body had stopped providing good blood flow to her intestines—either because of her brain injury or because of a blow to her intestines. Dr. Barton also testified that the child would have died without medical intervention and that the injuries met her criteria of "child torture." Within two days of her admission to the hospital, the child woke up from the coma and came off the ventilator. After about a week in the hospital, she was released.[1]

At the sentencing hearing, both the State and appellant called numerous witnesses. Appellant chose to testify and admitted to causing the child's injuries. She testified that she had a chaotic childhood and was sexually abused by her father. She also testified that, when the incident occurred, she was in an abusive relationship with the child's father and, the night before she injured her child, the child's father had pulled appellant's hair, choked her, and dragged her. Appellant was also worried about how she would get money to pay the rent. Appellant testified that the child was crying and that appellant could not console her. Appellant admitted to hitting the child and "kick[ing] her, constantly[.]" She recalled gluing the child's hands to the wall but did not recall biting her.

After the trial court found appellant guilty and assessed punishment, appellant filed a motion for new trial in which she claimed that she was denied effective assistance of counsel. Appellant argued that (1) her court-appointed trial counsel Angie N'Duka "promised and or

---

[1] A CT scan revealed that the child had a broken rib that was healing, and that the break occurred at least fourteen days before the child was admitted to the hospital.

guaranteed [appellant] that if she plead[ed] guilty to the trial court instead of a jury that [appellant] would receive deferred probation" and (2) N'Duka "never fully explained to [appellant] about the 45 year plea bargain offer made to her by the State." Appellant argued that N'Duka "claimed the plea bargain offer was ridiculous" and that "there was not any way" that appellant would "receive a sentence as high as 45 years because the victim did not die." Appellant also claimed that N'Duka "never spent any time preparing" appellant for trial or for her testimony, "never took time to gather sufficient facts of the case" in order to "provide competent advice" to appellant during the punishment phase of trial, and was unable to provide "effective assistance of counsel" at the punishment hearing because she "did not conduct an independent investigation on any issue of mitigation."

At the hearing on the motion for new trial, appellant testified that N'Duka presented her with the State's plea bargain offer of a recommended sentence of forty-five years in exchange for her guilty plea. Appellant testified, "I told her there was no way I was taking that and she told me not to worry that she had already told [the assistant district attorney] that it was ridiculous" and that "there was no way in the world I was going to do 45 or get more than 45 because I was a first-time offender and my victim didn't die."[2] Appellant testified that N'Duka "promised or guaranteed" that she would get deferred adjudication probation if she pleaded guilty and that appellant "believed her." Appellant testified that she relied on N'Duka's promise by enrolling in GED classes and intending to study medical terminology, taking parenting classes, and attending therapy. Appellant also testified that, when she met with N'Duka prior to the plea hearing, they "didn't talk much" and that N'Duka "would just tell me everything was the same, that nothing had changed." Appellant testified that these communications made her believe she was "still

---

[2] Appellant also testified that N'Duka did not explain whether time served under the plea bargain offer would be aggravated time or non-aggravated time with respect to parole.

–4–

going to get deferred probation[.]" Appellant testified that she would have taken the forty-five year plea bargain "if everything had been explained to [her] how serious this was[.]"

Appellant also testified that her counsel was ineffective because she did not adequately prepare appellant to testify and did not explain "what testifying meant[.]" Appellant testified that N'Duka only explained that she had a Fifth Amendment right not to testify "[a]t the last minute" and that the first time N'Duka asked her if she wanted to testify was when appellant was about to go up on the witness stand.

On cross-examination, appellant testified that she still would have pleaded guilty if she "had to do it all over again[.]" She also testified that she met with N'Duka two or three times while she was in jail before posting bond and around ten additional times after she posted bond and before the sentencing hearing. Appellant testified that N'Duka "guaranteed" her that she would get probation. Appellant also testified that N'Duka did not work on her behalf "100 percent" because she "did not explain to [appellant] what the [plea bargain] offers were" and told appellant that the State "had to come down," so appellant "believed her." Appellant testified, "If I would have known 45 was going to stay the same, I would have taken the 45."

Appellant also testified that she believed that N'Duka "needed to look more into" appellant's case by having doctors testify that appellant was "not a bad person." Appellant testified that she believed that N'Duka spoke with all of the people that she and her mother identified as possible witnesses. Appellant testified there was "one person" whom she wished had testified who did not: a psychiatric doctor whom she had seen after posting bond. But appellant admitted that she "honestly [didn't] know what he was going to say." Appellant also admitted that doctors who testified said that she was not "honest on the test[.]"

Appellant also admitted that she made the wrong choice by testifying and by not answering the prosecutor's questions "because [she] was scared." In addition, appellant testified

that she signed the plea agreement document that included an admonition by the court that punishment by confinement for the charged offense ranged from five to ninety-nine years or life. She testified that the judge also went over the punishment range for her offense orally with her.

The State called N'Duka, who testified that she had been licensed since May 1995, seventy to seventy-five percent of her practice involves criminal defense, and she has experience handling child abuse cases and cases alleging injury to a child. She testified that criminal defendants had filed grievances against her, but that the State Bar had not upheld any of the grievances. She also testified that she had been accused of ineffective assistance of counsel, but those allegations had also not been upheld. N'Duka testified that it is "generally the case" that "defendants who are unhappy with the result . . . blame their lawyer[.]" N'Duka testified that she "did not promise or guarantee Elizabeth that a judge would give her probation." N'Duka testified that she had "been practicing way too long" to promise or guarantee probation or deferred adjudication. She also testified that she "can't guarantee you what the judge will ultimately do, especially in this case" and that she could only promise to deliver her best efforts.

N'Duka testified that appellant "insisted she did not want a trial, she wanted a plea." She also testified that she described the State's plea offer of forty-five years as ridiculous. She thought that, in light of appellant's lack of criminal history and the child's recovery without any residual injuries, she could get the State "to come off 45 years, which [they] didn't." N'Duka testified that, when N'Duka "gave [appellant] the offer she outright rejected it" and that it "was her decision." N'Duka also testified that appellant's contention that N'Duka had promised appellant probation was "something she's making up for the purpose of this hearing" and that appellant knew that N'Duka "did not promise her probation."

N'Duka testified about the work she did in appellant's case in an effort to present appellant in the best light possible to the court, including moving for appointment of a doctor as

an expert to assess appellant, working with a private investigator, locating potential witnesses to testify on appellant's behalf, and striving to get evidence of the steps that appellant was taking to improve herself before the judge. N'Duka testified that appellant lacked employment records and her school records did not portray her positively, so the evidence supporting appellant was "what she was doing right then and there."

In addition, N'Duka testified that she advised appellant that she had a right to testify or not testify and that it was appellant's choice. N'Duka also testified that she explained deferred adjudication to appellant. N'Duka described how, during numerous meetings, "we spent a lot of time trying to show her how to testify if she was going to testify." N'Duka testified that she tried to get appellant "to break that facade as a very strong and disconnected person" and, because she was entering a guilty plea, to "take responsibility" during her testimony. N'Duka also testified that she asked appellant before appellant took the stand if appellant "want[ed] to do this[,]" if she thought she could "handle it[,]" and if appellant saw "how the prosecutor is getting at the witnesses[,]" and that appellant "said she was going to testify."

N'Duka testified that she worked "very hard" on the case, that she prepared appellant to testify as well as she could, and that there "was nothing else [she] knew to do with [appellant's] case, no other mitigating witnesses or factors out there that . . . [she] could have brought to the attention of the Judge." On cross examination, N'Duka testified that, when the testimony appeared to be harmful to appellant, there was no discussion about trying to reopen the plea bargain.

The trial court denied appellant's motion for new trial and this appeal followed.

### Ineffective Assistance of Counsel

In her first two issues, appellant argues that her guilty plea was involuntary and her conviction should be set aside because she received ineffective assistance of counsel in violation

of the Sixth Amendment to the United States Constitution and/or articles 9 and 10 of the Texas Constitution. *See* U.S. CONST. amend. VI; Tex. Const. arts. IX, X.

### *Standard of Review*

We review a trial court's denial of a motion for new trial that alleged ineffective assistance of counsel under an abuse of discretion standard. *See Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004), *superseded in part on other grounds by* TEX. R. APP. P. 21.8(b), *as stated in State v. Herndon*, 215 S.W.3d 901, 905 n.5 (Tex. Crim. App. 2007); *Sanchez v. State*, 243 S.W.3d 57, 63 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). We must determine whether the trial court's denial of the motion for new trial and its resolution of the ineffective assistance of counsel claim were clearly wrong and outside the zone of reasonable disagreement. *See Sanchez*, 243 S.W.3d at 63.

### *Applicable Law*

### *Voluntariness of Guilty Plea*

A guilty plea must be entered knowingly, intelligently, and voluntarily to be consistent with due process. *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006); *see* TEX. CODE CRIM. PROC. ANN. art. 26.13(b) (West Supp. 2013). In order to be voluntary, "a guilty plea must be the expression of the defendant's own free will and must not be induced by threats, misrepresentations, or improper promises." *Kniatt*, 206 S.W.3d at 664. If a defendant pleads guilty as a result of ineffective assistance of counsel, the plea is not knowing or voluntary. *Ex parte Moussazakeh*, 361 S.W.3d 684, 688–89 (Tex. Crim. App. 2012). Likewise, if a defendant pleads guilty based upon erroneous advice of counsel, the plea is not given voluntarily and knowingly. *Id.* at 689. Counsel has a duty to provide his client with advice concerning what plea to enter, and counsel's advice should be informed by adequate investigation of the facts of the case or counsel's reasonable decision that investigation was unnecessary. *Ex parte*

–8–

*Harrington*, 310 S.W.3d 452, 458 (Tex. 2010).  We determine the voluntariness of a guilty plea from the totality of the circumstances viewed in light of the entire record.  *Ducker v. State*, 45 S.W.3d 791, 796 (Tex. App.—Dallas 2001, no pet.).

### *Ineffective Assistance*

When examining ineffective assistance of counsel claims, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to obtain reversal based on ineffective assistance of counsel, the appellant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for the attorney's unprofessional errors, the result of the proceeding would have been different.  *Padilla v. Kentucky*, 559 U.S. 357, 366 (2010); *Strickland*, 466 U.S. at 688, 694; *see Nava v. State*, 415 S.W.3d 289, 307–08 (Tex. Crim. App. 2013).

With respect to the first prong, there is a strong presumption that the conduct of counsel was not deficient.  *Nava*, 415 S.W.3d at 307–08.  As a result, the appellant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  We "commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it."  *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005).  In the context of a claim that an appellant's plea was involuntary because of ineffective assistance of counsel, whether the plea was voluntary depends upon whether the attorney's plea "advice was within the range of competence demanded of attorneys in criminal cases[.]"  *Harrington*, 310 S.W.3d at 458.  In addition, we judge the reasonableness of counsel's challenged conduct on the facts of the particular case and view it as of the time of the counsel's conduct.  *Strickland*, 466 U.S. at 690; *Andrews*, 159 S.W.3d at 101.

For the second prong, appellant must "show a reasonable probability that: (1) he would have accepted the earlier offer if counsel had not given ineffective assistance; (2) the prosecution would not have withdrawn the offer; and (3) the trial court would not have refused to accept the plea bargain." *Ex parte Argent*, 393 S.W.3d 781, 784 (Tex. Crim. App. 2013); *see Missouri v. Frye*, 132 S.Ct. 1399, 1409 (2012); *Lafler v. Cooper*, 132 S.Ct. 1376, 1385 (2012).[3]

We must be highly deferential in our review of counsel's performance. *Andrews*, 159 S.W.3d at 101. An appellant's failure to make the required showing of either deficient performance or sufficient prejudice negates our need to consider the other prong. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Andrews*, 159 S.W.3d at 101.

### *Appellant's Arguments*

Appellant argues that, through her testimony at the hearing on the motion for new trial, appellant "has shown by a preponderance of the evidence" that appellant pleaded guilty "based on the advice of her attorney that she would receive a probated sentence[.]" Appellant argues that this "misrepresentation coupled together with other specific instances of acts or omissions on the part of trial counsel" satisfy *Strickland*'s "totality of the representation standard . . . at the time of the plea" and establish that appellant's plea was involuntary because of ineffective assistance of counsel. *See Bridge v. State*, 726 S.W.2d 558, 571 (Tex. Crim. App. 1986) ("In determining whether counsel has provided effective assistance, a court looks to the totality of the representation.").

Appellant argues that N'Duka "misrepresented the outcome of a plea of guilty before the trial judge in the circumstances of this case" because (1) N'Duka told appellant that N'Duka told the prosecutor that the plea offer of forty-five years was "ridiculous" because appellant was a first-time offender and the victim did not die, (2) N'Duka "promised" appellant that, if she

---

[3] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Nava*, 415 S.W.3d at 308.

pleaded guilty, "she would get deferred adjudication probation[,]" and (3) N'Duka did not explain the possibility of parole, aggravated time, or non-aggravated time to appellant. Appellant asserts that "[i]t is obvious that Appellant would not have plead[ed] guilty except for" N'Duka's misrepresentation and that "[t]his clearly demonstrates" N'Duka's ineffective representation and renders appellant's guilty plea involuntary.[4]

### *The State's Arguments*

The State argues that appellant's argument that her plea was involuntary because of ineffective assistance by counsel lacks merit. The State contends that the record establishes that (1) appellant knew that she was entering an open plea of guilty and there was no agreement with the State concerning her punishment, (2) appellant was properly admonished in accordance with article 26.13 of the code of criminal procedure,[5] (3) the record does not support appellant's claim that N'Duka promised or guaranteed appellant that she would receive probation, (4) N'Duka's comment that the State's plea offer of forty-five years was ridiculous did not constitute misinformation but rather was N'Duka's belief,[6] and (5) there is no evidence other than appellant's own testimony that appellant was misinformed. In addition, the State argues that appellant's contention that she "would not have plead[ed] guilty except for the misrepresentation of counsel" is not correct because appellant admitted during the hearing on her motion for new trial that, if she could do things over again, she would still have pleaded guilty but would have taken the State's offer of forty-five years.

---

[4] Appellant proposes that *Frye*, 132 S.Ct. at 1408–09, and *Lafler*, 132 S.Ct. at 1383, 1391, support her position. But *Frye* is distinguishable because it concerned an attorney's deficient performance in failing to communicate a plea offer to his client before it expired. 132 S.Ct. at 1408–09. And *Lafler* concerned the second prong of the *Strickland* test: whether ineffective representation prejudiced a defendant. *Lafler*, 132 S.Ct. at 1383, 1391. We base our decision on the first prong.

[5] *See* TEX. CODE CRIM. PROC. ANN. art. 26.13(d).

[6] *See Brown v. State*, 896 S.W.2d 327, 328–29 (Tex. App.—Houston [1st Dist] 1995, pet. ref'd) (stating a guilty plea "will not support a conviction if that plea is made after the defendant receives significant misinformation from the court or one of its officers").

The State contends that appellant has not rebutted the presumption that her plea was knowing and voluntary and has not shown that N'Duka's representation fell below an objective standard of reasonableness. The State argues that the record reflects N'Duka's multiple meetings with appellant, her efforts to explain to appellant the various options available at trial, her attempt to secure a favorable plea bargain for appellant, her thorough investigation of appellant's character and background, her efforts to prepare appellant to testify effectively, her challenges to the State's evidence at the punishment phase, and her presentation of a compelling and comprehensive case to try to attain probation for appellant.

*Analysis*

We agree with the State that appellant has not met her burden to establish that N'Duka's performance fell below an objective standard of reasonableness. At the hearing on the motion for new trial, appellant admitted that she had been admonished both orally by the judge and in writing that the punishment range for the charged offense ranged from five to ninety-nine years or life. Although appellant testified that N'Duka promised or guaranteed that appellant would get probation, N'Duka denied promising or guaranteeing probation. N'Duka testified that she described the State's forty-five year offer as "ridiculous" and that she thought that she could convince the State to reduce the number of years in the plea offer. But N'Duka testified that she knew from experience that she could not guarantee what the judge would do and that she could only promise to deliver her best efforts. In addition, appellant claimed that N'Duka did not adequately prepare appellant to testify and did not present the testimony of one witness whom appellant wanted to have testify. But N'Duka testified concerning her extensive efforts to meet with and counsel appellant about how to testify effectively and to investigate the case, locate witnesses, and present appellant in the best light possible to the court.

The trial court, as the trier of fact, was the sole judge of witnesses' credibility and the inferences to be drawn from their testimony. *Melton v. State*, 987 S.W.2d 72, 75 (Tex. App.—Dallas 1998, no pet.) (stating trial court is sole judge of credibility and weight of testimony at hearing on motion for new trial). This Court may not substitute its judgment for the judgment of the trial court. *Brennan v. State*, 334 S.W.3d 64, 72 (Tex. App.—Dallas 2009, no pet.); *see Messer v. State*, 757 S.W.2d 820, 824 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd). Based on the testimony, the record before the court, and the court's own knowledge of the events in the case, the court could reasonably have found that appellant's plea was knowingly, intelligently, and voluntarily made and that N'Duka's representation was not deficient. *See Messer*, 757 S.W.2d at 824, 826; *see also Kniatt*, 206 S.W.3d at 664.

We overrule appellant's first and second issues.

## Admission of Evidence

In her third issue, appellant argues that the trial court erred in admitting recordings of two telephone calls that appellant made from the county jail.

### *Background*

During the sentencing hearing, Scott Seacat, a technical administrator with Unisis—the contracting company that operates the inmate phone system for Dallas County—testified. Seacat's responsibilities include ensuring that the recording system that maintains the jail phone calls is working properly. Seacat testified that inmates are notified that their calls are recorded through an "introductory message for both the inmate and the called party to hear" that states "that the calls are monitored or recorded."

The State began questioning Seacat regarding State's exhibit 108, which the State alleged contained recordings of two phone calls that appellant made from jail, and appellant objected that the recordings were inadmissible under code of criminal procedure article 38.23 because the

–13–

telephone calls were illegally intercepted under penal code section 16.02. *See* TEX. PENAL CODE ANN. § 16.02 (West Supp. 2013); TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2005). Appellant's counsel argued, "I believe when Ms. Escalona was testifying, she testified that she did not know, because [the prosecutor] did ask her about phone calls that she made from jail and she did testify that she did not know her calls were being recorded." In her prior testimony, however, in answer to the State's question of whether she knew "phone conversations from the jail" were recorded, she replied, "I believe so." But she also denied hearing a statement on the phone calls informing her that the calls were being recorded. Appellant also objected under rule of evidence 901. *See* TEX. R. EVID. 901 (requirement of authentication or identification). The trial court overruled her objections under section 16.02 and article 38.23, but did not rule on her objection under rule of evidence 901.

Seacat then testified that the computer data from State's exhibit 108 "link[ed]" the phone calls to appellant by her inmate identification number, which is a number "for that particular inmate."

The State later called Detective Abel Lopez and asked Lopez to identify whether one voice on the phone calls on exhibit 108 was appellant's voice. Lopez testified that he had previously spoken with appellant for two hours and forty-five minutes on the day of appellant's arrest. Appellant objected that the State failed to authenticate the recordings under rule of evidence 901 and that the recordings were hearsay because the other party on the phone conversations was not present for appellant to cross-examine. The court overruled both objections and admitted the exhibit.

–14–

## Standard of Review

We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). We will uphold the ruling if it is within the zone of reasonable disagreement. *Id.*

## Applicable Law

Appellant argues that the trial court erred in admitting the phone calls because they were not properly authenticated and they were inadmissible under article 38.23 of the code of criminal procedure as illegal intercepts of electronic communications. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23; TEX. R. EVID. 901.

Article 38.23 states that no evidence obtained in violation of law shall be admitted into evidence. TEX. CODE CRIM. PROC. ANN. art. 38.23. The Texas Wiretap Statute provides that a person commits an offense if the person "intentionally intercepts, endeavors to intercept, or procures another person to intercept or endeavor to intercept a wire, oral, or electronic communication[.]" TEX. PENAL CODE ANN. § 16.02(b)(1). It is an affirmative defense to section 16.02(b) if "a person acting under color of law intercepts" a "wire, oral, or electronic communication . . . if one of the parties to the communication has given prior consent to the interception[.]" *Id.* § 16.02(c)(3)(A).

Rule of evidence 901 provides in relevant part that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX. R. EVID. 901(a). Subsection (b) lists non-exclusive examples of authentication or identification that comply with the requirements of rule 901, and includes:

(5) *Voice identification.* Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at anytime under circumstances connecting it with the alleged speaker.

TEX. R. EVID. 901(b)(5).

### *Arguments of the Parties*

Appellant argues that the trial court erred in admitting the recorded phone calls because they were not properly authenticated under rule of evidence 901 "because the State could identify only appellant's voice, and not the other voice, on the recording." She also argues that recording her phone conversations from jail violated penal code section 16.02 and, as a result, the phone calls were inadmissible under code of criminal procedure article 38.23. Appellant contends that her ninety-nine year sentence "show[s]" that this admitted evidence "unduly harmed and prejudiced" her.

The State argues that the trial court did not abuse its discretion in admitting State's exhibit 108 because (1) appellant was aware that her calls were being recorded and the calls were not illegally intercepted and (2) the calls were properly authenticated under rule 901 on the grounds that there was evidence that the calls were made under appellant's personal identification number, Lopez was qualified to identify appellant as the source of one of the voices in the telephone calls, and it was not necessary to identify the second voice on the recordings. The State also argues that, even if it was error to admit State's exhibit 108, any error was harmless.

### *Analysis*

We agree with the State that the trial court did not abuse its discretion in admitting the recordings of the two phone calls. Appellant made these phone calls while she was in jail awaiting her trial. *See State v. Scheineman*, 77 S.W.3d 810, 813 (Tex. Crim. App. 2002) (stating that "[l]oss of privacy is an inherent incident of confinement" and concluding that arrestee had

–16–

no "legitimate expectation of privacy in conversations between arrestees who are in custody in a county law enforcement building" and recorded statements made during conversation between arrestees were admissible). Seacat testified that a prompt notifies inmates at the beginning of each phone call that their calls are monitored or recorded. When asked if she was aware that that phone conversations from jail were recorded, Appellant testified that she "believe[d] so" but she denied hearing a prompt on the phone calls informing her that the calls were recorded. Based on the record, the trial court could have reasonably concluded that appellant impliedly consented to the recording of the phone calls and, as a result, the phone calls were not illegally intercepted. TEX. PENAL CODE ANN. § 16.02(c)(3)(A); *see Banargent v. State*, 228 S.W.3d 393, 396, 402–04 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (concluding that recording of jail telephone calls did not violate section 16.02 because appellant impliedly consented to the recording as a prompt on the calls and postings in jail indicated calls may be recorded or monitored and, as a result, the court did not err by denying appellant's request to instruct jury under code of criminal procedure 38.23). We conclude that the trial court did not abuse its discretion in admitting State's exhibit 108 under article 38.23. TEX. CODE CRIM. PROC. ANN. art. 38.23.

We also conclude that the trial court did not abuse its discretion in concluding that the recordings of the phone calls on State's exhibit 108 were properly authenticated under rule 901. Seacat testified that the phone call recordings were linked to appellant's inmate identification number. And Lopez identified appellant's voice as one of the two voices on the phone calls. It was not necessary to identify both voices on the phone call recordings in order for the State to prove that the recordings were what the State claimed them to be. *See Banargent*, 228 S.W.3d at 401 (concluding testimony by those who work with the phone system and the victim's identification of appellant's voice properly authenticated recordings of phone calls and that it was not necessary to identify both voices in the recordings); *Jones v. State*, 80 S.W.3d 686, 688–

89 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (involving allegation that audio tape was not properly authenticated because informant did not identify all voices on the tape and concluding that court was "unwilling to read into the rule a requirement that each person, no matter how irrelevant to the case, be identified by name").

We overrule appellant's third issue.

## Due Process

In her fourth issue, appellant contends that the trial court denied her due process of law because she was denied a fair and impartial judge at the sentencing hearing.

### *Background*

Appellant bases her argument on the following comments by the trial judge at the sentencing hearing. In her appellate brief, appellant emphasizes the words italicized below.

> THE COURT: Be seated, please. This has been a very long week. I have heard compelling evidence from the State, heartbreaking evidence from the State. I have heard compelling evidence from the defense, compelling evidence from the defense. Outside of the context of this trial, you would give her great sympathy. I believe you to be the victim of a sexual assault when you were a child. I believe you to be the repeated victim of acts of domestic violence. Again, outside of the context of this trial, I think even the State would find you to be a sympathetic figure, because they prosecute people for what was done to you. *But I can't consider that evidence outside of the context of this trial.*
>
> To me it comes down to a single, salient fact. On September 7, 2011, you savagely beat your child to the edge of death. For this, you must be punished. Please stand.
>
> Elizabeth Denise Escalona, I find you guilty of the offense charged. I'll set your sentence at confinement in the penitentiary for a period of 99 years. The sentence goes into effect today. As required by law, you will receive all back-time credit.
>
> Counsel, is there any reason in law why sentence should not be pronounced at this time?
>
> [Appellant's Counsel]: No, Your Honor.

–18–

*Arguments and Analysis*

Appellant admits that she did not object to the court's assessment of the ninety-nine year sentence or ask the judge to recuse himself based upon the judge's comments. *See* TEX. R. APP. P. 33.1(a) (stating requirement that a complaint must have been made to the trial court by timely request, objection, or motion to preserve complaint for appellate review). But appellant argues that it was not necessary for her to object to preserve error because the judge's comments constituted fundamental error affecting substantial rights. *See* TEX. R. EVID. 103(d). Appellant relies on *Blue v. State*, 41 S.W.3d 129, 131–32 (Tex. Crim. App. 2000) (plurality op.). In *Blue*, the trial judge apologized to a venire panel for their long wait, stated that the accused had delayed his docket by going "back and forth" on an offer by the State, and said that he "prefer[red] the defendant to plead." *Id.* at 130. A plurality of the court of criminal appeals concluded that the "comments of the trial judge, which tainted appellant's presumption of innocence in front of the venire, were fundamental error of constitutional dimension and required no objection." *Id.* at 132.

But the facts of this case are distinguishable from *Blue*. *See Unkart v. State*, 400 S.W.3d 94, 101 (Tex. Crim. App. 2013). As the State argues, the judge in *Blue* made his comments to the venire panel prior to trial and his comments concerned the defendant's consideration of a guilty plea. Here, appellant entered an open plea of guilt and the judge made his allegedly improper comments concerning possible mitigation evidence at the punishment phase. As a result, the basis for the plurality opinion's conclusion in *Blue*—that the judge's comments tainted appellant's presumption of innocence in front of the venire—is not at issue here. We overrule appellant's fourth issue.

–19–

**Ineffective Assistance by Failing to Object**

In her fifth issue, appellant argues that she received ineffective assistance of counsel when her attorney did not object when the trial court assessed a ninety-nine year sentence after the trial judge made the comments about which appellant complains in issue four. Appellant contends that the judge found that "the Defendant presented a compelling case for mitigation but [the court] would not give it any consideration" and that counsel's "failure to object was not strategic." Appellant states that she incorporates the authorities that she cites in issues one and two to support her argument.

The State argues that we should deny as speculative appellant's claim that her counsel was ineffective by not objecting to the trial court's comments because appellant did not properly develop the record concerning this issue at trial or pursuant to the motion for new trial. *See Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) ("Ineffective assistance of counsel claims are not built on retrospective speculation; they must 'be firmly founded in the record.' That record must itself affirmatively demonstrate the alleged ineffectiveness." (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999))). The State contends that, at the hearing on appellant's motion for new trial, appellant did not ask N'Duka why she did not object to the sentence or to the trial court's allegedly improper comments. Citing *Thompson*, 9 S.W.3d at 813–15, the State contends that a silent record cannot overcome the presumption that N'Duka provided effective assistance. And the State argues that, in any event, the trial judge's comments do not demonstrate a lack of impartiality.

We agree with the State that appellant's claim of ineffective assistance of counsel based on counsel's alleged failure to object to the sentence imposed or to the judge's comments at sentencing is speculative. *See Bone*, 77 S.W.3d at 835. At the hearing on the motion for new trial, appellant did not ask N'Duka why she did not object to the judge's comments and the

record does not otherwise reveal her reasons for not objecting. *See Johnson v. State*, 68 S.W.3d 644, 655 (Tex. Crim. App. 2002) (concluding that, where record did not reveal defense counsel's reasons for not objecting to prosecutor's comments and "[g]iven the presumption of effectiveness and the great deference [the court] give[s] to decisions made by defense counsel," the court saw nothing in the record to compel the court to find counsel ineffective); *Thompson*, 9 S.W.3d at 814 (concluding that, where record was silent concerning why appellant's trial counsel failed to object to the State's attempts to elicit inadmissible hearsay, appellant failed to rebut the presumption that attorney's actions were reasonable). We overrule appellant's fifth issue.

## CONCLUSION

We resolve appellant's five issues against her and affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
Tex. R. App. P. 47.2(b)

121418F.U05

–21–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ELIZABETH DENISE ESCALONA,
Appellant

No. 05-12-01418-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1159638-V.
Opinion delivered by Justice Lang-Miers,
Justices Francis and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 20th day of February 2014.

/Elizabeth Lang-Miers/

ELIZABETH LANG-MIERS
JUSTICE